UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

-------------------------------------------------------- x
                                               :

KAREN HEDMAN-OUELLETTE           :                3:07 CV 1462 (PCD)
                                               :

V.                                      :
                                               :

MICHAEL J. ASTRUE                   :
COMMISSIONER OF SOCIAL SECURITY   :       DATE: JANUARY 30, 2009
                                               :

-------------------------------------------------------- x

<u>RECOMMENDED RULING ON PLAINTIFF'S MOTION FOR ORDER REVERSING THE
DECISION OF THE COMMISSIONER AND DEFENDANT'S MOTION FOR ORDER AFFIRMING
THE DECISION OF THE COMMISSIONER</u>

        This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g)

and 1383(c)(3), as amended, seeks review of a final decision by the Commissioner of

Social Security ["SSA"] denying plaintiff Disability Insurance Benefits ["DIB"] and

Supplemental Security Income ["SSI"] disability benefits.

<u>I.  ADMINISTRATIVE PROCEEDINGS</u>

        On April 8, 2003, plaintiff, Karen Hedman-Ouellette filed her application for DIB

and SSI, alleging an inability to perform substantial gainful activity since May 28, 2002

because she suffers from severe depression, migraines, degenerative joint disease of the

knees, degenerative disc disease of the low back, and fibromyalgia.  (<u>See</u> Certified

Transcript of Administrative Proceedings, filed January 10, 2008 ["Tr."] 60-62, 463-66).

The Social Security Administration ["SSA"] denied plaintiff's claim both initially and upon

reconsideration.  (<u>See</u> Tr. 42-49, 51-54, 467-72).  On April 5, 2004, plaintiff requested a

hearing before an Administrative Law Judge ["ALJ"], and plaintiff's first hearing was held

before ALJ Eileen Burlison on March 7, 2005.  (<u>See</u> Tr. 41, 55-57, 473-80).  On June 19,

2005, ALJ Burlison issued her decision denying plaintiff's claim. (<u>See</u> Tr. 481-95). On July 15, 2005, plaintiff filed a request for review from the Appeals Council; the Appeals Council vacated and remanded the case on September 1, 2005. (<u>See</u> Tr. 498-501; <u>see also</u> Tr. 496-97). A second hearing was held on November 16, 2005. (<u>See</u> Tr. 599-622; <u>see also</u> Tr. 27-37). Plaintiff was represented by counsel at both hearings. (<u>See</u> Tr. 38-40, 58-59, 484, 502, 599). On July 27, 2006, ALJ Burlison denied plaintiff's claim. (<u>See</u> Tr. 14-26).[1] On September 6, 2006, plaintiff requested review of ALJ Burlison's decision by the Appeals Council. (<u>See</u> Tr. 12-13). On August 8, 2007, the Appeals Council denied plaintiff's request for review, rendering ALJ Burlison's decision the final decision of the Commissioner. (<u>See</u> Tr. 9-11).

Plaintiff filed this Complaint on October 1, 2007 (Dkt. #1), in response to which the Commissioner of Social Security ["the Commissioner"] filed his Answer on January 10, 2008. (Dkt. #11).[2] Thereafter, on June 30, 2008, plaintiff filed her Motion to Reverse the Decision of the Commissioner, or in the Alternative Motion to Remand for a New Hearing, and brief in support. (Dkts. ##20-21). On September 5, 2008, defendant filed his Motion for Order Affirming the Final Administrative Decision of the Commissioner and brief in support. (Dkt. #24; <u>see</u> Dkts. ##22-23). On October 22, 2007, Senior United States District Judge Peter C. Dorsey referred this case to this Magistrate Judge. (Dkt. #7).

---

[1]Page 11 of the ALJ's Ruling, containing Findings 6 through 10, was missing from the administrative transcript. As a result, on September 24, 2008, an Order was filed (Dkt. #25) directing the parties to file this document; the missing page was filed five days later (Dkt. #26), and hereinafter is referred to "Dkt. #26." There is, unfortunately, unidentified handwriting on this page 11, which will be ignored.

[2]Attached to defendant's Answer is a certified copy of the administrative record, dated November 20, 2007.

For the reasons stated below, plaintiff's Motion for Order Reversing the Decision of the Commissioner, or in the alternative, Motion for Remand for a New Hearing (Dkt. #20) is **granted** and defendant's Motion for Order Affirming the Decision of the Commissioner is (Dkt. #24 ) is **denied**.

## II. FACTUAL BACKGROUND

Plaintiff was born on August 30, 1962 and is currently forty-six years old. (Tr. 60). Plaintiff has two children, ages nine and sixteen,[3] both of whom live with her and attend school. (Tr. 91, 605-06, 609).[4] She stayed at home with her children when they were young. (Tr. 604). Plaintiff attended hairdressing school and worked periodically as a hairdresser for fifteen years. (Id.). Plaintiff graduated from high school in 1980 and subsequently completed training to become a licensed practical nurse ["LPN"]. (Tr. 603-05; see also Tr. 62). Plaintiff worked as an LPN at New Britain Hospital and then worked for Pharmerica doing data entry work. (Tr. 603-05). Plaintiff has been married twice and has been separated from her second husband for at least two years. (Tr. 606, 609). Currently, she is the caretaker of her two children, and receives help from her parents, who live three streets away from plaintiff.[5] (Tr. 91, 607, 617).

_____

[3] Plaintiff described her sixteen year old daughter as "self-sufficient" and "responsible"; her daughter helps to take care of plaintiff's nine year old son. (Tr. 607, 617).

[4] At her hearing, plaintiff testified that no one lives with her and her children, but that she has a boyfriend who was at her home "just about every day" for the previous two and a half months. (Tr. 605-06).

[5] Plaintiff testified that her parents take her children to school and sometimes bring them home from school. (Tr. 608).

3

According to plaintiff, she suffers from migraine headaches, depression,[6] post-traumatic stress disorder, anxiety, arthritis, fibromyalgia, irritable bowel syndrome, and degenerative disk disease which causes pain in her knees, shoulder, hand and back.  (Tr. 73, 81, 610, 612-16; see also Tr. 101).  She testified that her fibromyalgia causes her to have extreme fatigue and an aching pain in her muscles that makes her feel as though she has the flu all the time.  (Tr. 613; see Tr. 102).  She also reports suffering from significant short and long-term memory problems.  (Tr. 81, 99, 110, 613).  Plaintiff testified that she sees a doctor or nurse practitioner weekly.  (Tr. 610).  According to plaintiff, her condition is "very unpredictable" because of her pain and exhaustion.  (Tr. 73; see also Tr. 104, 107).  She is unable to perform work duties and keep "regular reliable attendance."  (Tr. 82).  Additionally, she has become "isolated and withdrawn," and her conditions affect her ability to sit, climb stairs, see, lift, stand, reach, talk, squat, kneel, and use her hands.  (Tr. 98).  According to plaintiff, she is "totally stressed trying to manage and cope with all [her] problems and physical limitations."  (Tr. 99).  Additionally, plaintiff's "most distressing symptom" is "word finding difficulty and very poor concentration." (Tr. 109).

At her second hearing, plaintiff stated that she suffered from more anxiety and more arthritis than at the time of her first hearing and had lost at least twenty pounds in that time period due to her lack of appetite.[7]  (Tr. 612).   Plaintiff complained that she had trouble sleeping, is usually up two to four times a night, and slept a lot during the day.  (Tr. 92-93, 607, 619).  Plaintiff stated that she does not do household chores; her

---

[6]Plaintiff described her depression as "severe" with "suicidal ideation."  (Tr. 108).

[7]At the time of the hearing, plaintiff was approximately 5'4" tall and weighed about 175 pounds. (Tr. 612).

4

mother does her laundry and the children do "everything else." (Tr. 91, 94, 608). On an average day, plaintiff wakes up in the morning with her children and takes her medication, and after the children leave for school, she watches "a little bit of TV," takes a nap, watches some more TV, and sometimes reads. (Tr. 607; see Tr. 92). In the evenings she "make[s] sure that [her] son does his homework" and that there is something to eat for dinner. (Tr. 607; see Tr. 94). Plaintiff is able to drive a car, go to the bank, and do her own food shopping, but she usually takes one of her children to help her shop and to carry the groceries up the three flights of stairs to their apartment. (Tr. 96, 229, 607-08).[8] Plaintiff testified that she takes Ritalin for her fatigue, Percocet and Oxycontin up to ten times a day for her fibromyalgia and degenerative disk disease, Cyclobenzaprine and Lidocaine for pain, and Demerol, Relpax, Phenergan and Topamax for her migraines. (Tr. 614-17; see also Tr. 78, 80, 103, 111, 128).

According to plaintiff's Work History Report, completed on June 8, 2003, she could lift up to ten or twenty pounds, and frequently lifts less than ten pounds. (Tr. 85, 90). At the hearing, plaintiff testified that after ten minutes of standing or walking, her legs and back hurt, and she must sit down, rest, or lean up against something. (Tr. 618). After more than about a half an hour of sitting in a chair, plaintiff usually has to lay down. (Id.). Plaintiff can pick up a gallon of milk, but states that it hurts her arms, hands, and shoulder. (Tr. 619). Plaintiff is capable of maintaining her own personal hygiene, including showering, bathing, and using the toilet, but her sixteen year old daughter has to put her socks and shoes on for her, and sometimes buttons plaintiff's shirt if plaintiff's

---

[8]At the hearing, plaintiff testified that she drives around town, but on September 19,2002, she reported to Dr. Annette Macannuco that she is unable to drive. (Tr. 95, 229, 608).

hands hurt.  (Tr. 92, 618).  Plaintiff stated that her daughter also opens her medication vials for her, first thing in the morning.  (Tr. 618-19).

As previously discussed, plaintiff is a licensed practical nurse and a hairdresser. (Tr. 603). Plaintiff's prior work history includes employment as a data-entry clerk with Pharmerica, and as an LPN at New Britain General Hospital.  (Tr. 604-05; see also Tr. 130, 511).   Plaintiff's last full-time job was as a data-entry clerk from approximately November 2001 until May 2002, which position she left because she was sick "every other week and missing more and more time," and she felt that she "would have been let go" if she had not stopped working.  (Tr. 83, 605).  Before that, plaintiff worked as an LPN at New Britain General Hospital, from approximately May 1999 until August 2001, from which position she was "let . . . go" because she "kept getting ill" and missing "too much time."  (Tr. 83, 604; see also Tr. 517-37).  Prior to working as an LPN, plaintiff was home with her children, and before that, she worked periodically as a hairdresser for about fifteen years.  (Id.).

Plaintiff's medical records begin on June 19, 2000, when Dr. Jonathan D. Kirsch performed an MRI Scan and MR Angiography of plaintiff's brain.  (Tr. 399).[9]  Dr. Kirsch noted that "[n]o evidence of intracranial hemorrhage or midline shift" was present, and that "no focal aneurysms" were identified.  (Id.).   On November 17, 2000, Dr. Robert Gendler performed a chest x-ray of plaintiff at the request of Dr. Honor.  (Tr. 401).  The results were negative.  (Id.).

---

[9]Plaintiff's primary care doctor is Dr. Michael Honor.  (See Tr. 165-67, 182-84, 201-11, 221-22, 225, 292-93, 369-99).  Dr. Honor's treatment records reflect, inter alia, his treatment of plaintiff's migraines and history of fatigue.  (See Tr. 371-72, 380, 455).  Plaintiff's gynecological records also are in the administrative record; they are unremarkable. (See Tr. 352-68, 458-61).

Plaintiff was seen at the New Britain General Hospital emergency room on February 17, 2001, for a cough, fever, chills, "flu," sore throat, ear ache, muscle aches, sputum, and headache. (Tr. 139-48). In the medical report following plaintiff's physical exam, she is described as being "alert", "stable", and with "mild" distress. (Tr. 144). A chest x-ray revealed that "the lung fields, heart and osseous structures" were visualized to be "normal." (Tr. 147).

Three months later, on May 29, 2001, plaintiff was treated at the emergency room at New Britain General Hospital for abdominal pain, vomiting and diarrhea; plaintiff was admitted for two days. (Tr. 149-68). Dr. Ellen P. Donshik noted that "the possibility of a partial obstructive lesion in the distal descending or sigmoid colons cannot be ruled out," and that plaintiff's "lungs look clear," with "[n]o acute disease."[10] (Tr. 161-62). A CT scan of her abdomen and pelvis revealed a "[p]robable right pericardial cyst"; the remainder of her abdominal and pelvic exam reflected no other abnormalities. (Tr. 163). An abnormal ultrasound revealed hepatosplenomegaly. (Tr. 164).

On June 1, 2001, plaintiff was examined by Dr. Mark Versland of Digestive Disease consultants, P.C., who noted that "[h]er presentation is not classic for ischemic colitis," although plaintiff's attacks of pain "could be due to mild colitis related to C.difficile." (Tr. 223-24). Dr. Versland further noted that plaintiff's recent symptoms "do not explain her long-standing symptoms dating back to last year of diarrhea with some constipation, nor [do they] explain an albumin of 2.7 in an otherwise healthy individual, nor [do they

---

[10]A radiologic report conducted by Dr. Sidney Ulreich on April 24, 2003 showed that plaintiff's "lung fields, heart and osseous structure" were "visualized to be normal." (Tr. 400).

explain] her anemia." (Tr. 224). A colonoscopy and biopsy conducted by Dr. Versland on June 28, 2001 revealed no evidence of inflammatory bowel disease. (Tr. 218-20).[11]

On August 31, 2001, Dr. Joel Gelber conducted an MRI scan of plaintiff's right knee and found that the "lateral meniscus [was] notable for a small focus of increased signal intensity," that there was a "large area of abnormal signal intensity consistent with an extensive tear involving the body and posterior horn of the medial meniscus," and that "the patellofemoral joint [was] notable for thinning of the patellar cartilage." (Tr. 173).

On September 17, 2001, plaintiff was seen by Dr. Robert S. Waskowitz, whose pre-operative diagnosis was a "[r]ight knee medial meniscus tear." (Tr. 172). He conducted a right knee arthroscopy and partial medial meniscectomy on October 24, 2001, with no complications. (Tr. 170-71).

Plaintiff was examined by Dr. Waskowitz on November 5, 2001, for follow-up regarding her right knee arthroscopy. (Tr. 169). Dr. Waskowitz concluded that plaintiff's surgical incisions were "clean and dry with no drainage," and that she had "an intact motor and sensory examination." (Id.). He recommended a course of physical therapy for plaintiff, and accordingly, on November 7, 2001, plaintiff was seen by Central Connecticut Sports Medicine Center ["CCSMC"], at which time her plan included two to three physical therapy sessions per week, for four to six weeks. (Tr. 169, 187). Plaintiff received four physical therapy sessions from November 7 to November 19, and ceased attending physical therapy on November 21, 2001. (Tr. 186; see Tr. 187). Plaintiff's physical therapist at CCSMC stated that plaintiff's goals were "met" at the time of

---

[11]Plaintiff had an unremarkable follow-up appointment on September 12, 2001 with Dr. Versland. (Tr. 217).

discharge, and that plaintiff "reported very little discomfort in the [right] knee [with] any activities." (Tr. 186).

On April 3, 2002, plaintiff saw Dr. Versland for a pre-endoscopy visit. (Tr. 216). Seven days later, Dr. Versland conducted an esophagogastroduodenoscopy; he noted that plaintiff was scheduled for gastric bypass surgery and that she had gastritis. (Tr. 214). Subsequent gastric biopsies revealed that plaintiff suffered from mild chronic inflammation but that there was no evidence of "Helicobacter-like organisms." (Tr. 215).

Plaintiff was examined by her rheumotologist, Dr. Feinglass, on July 17, 2002,[12] who noted that plaintiff was "obese," and that while her recent symptoms of "severe generalized myalgias, sleep disturbance, and chronic headaches, superimposed on a longer history of functional bowel problems and migraines," are "certainly strongly suggestive . . . of fibromyalgia," "[h]er examination does not strongly support this in that no definite trigger points are identified" even though "the history is strongly suggestive." (Tr. 199, 431-32). Dr. Feinglass proposed hypothyroidism as another consideration. (Tr. 199, 432). He noted that he was not sure what the explanation was for her overall symptom picture, but that it is "conceivable that there may be some chronic or latent viral infection accounting for her symptom complex and CPK." (Id.). Dr. Feinglass stated that plaintiff would be on a trial of Ultracef and would be on short-term disability from work. (Id.).

On August 14, 2002, plaintiff was seen at the New Britain General Hospital emergency room complaining of a "severe" headache and migraine; she was given

_____

[12]Medical records authored by Dr. Feinglass extend from June 13, 2002 through August 26, 2004. (Tr. 189-200, 283-86, 291, 409-32).

Phenergan and Morphine before being discharged.  (Tr. 174-85).[13]  A month later, on September 19, 2002, plaintiff was seen by Dr. Annette Macannuco of the Connecticut Spine and Pain Center, complaining of "[t]otal body pain." (Tr. 228-29).[14]   Plaintiff reported that "[a]ny movement brings on her pain," and that she utilizes a cane to ambulate.  (Tr. 228).  Plaintiff informed Dr. Macannuco that she had been assaulted in "December, 2001 where she hit her neck and head as a result of a domestic abuse," and that her pain had exacerbated after that point.  (Id.).  Plaintiff further revealed that she had been in two different motor vehicle accidents, eight and fifteen years prior, and had suffered a whiplash injury and multiple sites of soft tissue injury.  (Id.).  Additionally, plaintiff further reported having been assaulted and having her collar bone fractured when she was about twenty-two years old, and having had back surgery conducted by Dr. Zucker, which resulted in a foot drop.  (Id.).  Plaintiff stated that her back pain came on after she had sneezed, and that she had done aquatic and physical therapy, as well as chiropractic treatment, in the past.  (Id.).   Plaintiff further reported a history of depression with a suicide attempt at age eighteen, and stated that while she was experiencing increased stresses due to the current separation from her husband, she was not suicidal at the time.  (Tr. 229).  Dr. Macannuco noted that plaintiff was "alert" and "oriented," and that she walked with a mild antalgic gait and had limitations in lumbar flexion and extension. (Tr. 228-29).  An MRI performed that day revealed a "[n]ormal cervical spine." (Tr. 230).

---

[13]The medical records reveal that plaintiff underwent gastric bypass surgery "Friday."  (Tr. 180).  The medical records for the surgery are not contained in the administrative record before the Court.

[14]This medical report is not complete.

X-rays taken by Dr. Feinglass on September 12, 2002 revealed some degenerative disc disease and facet joint hypertrophy, specifically "[s]ignificant disc spacing at L5-S1" and "[m]ild-to-moderate narrowing . . . at L4-5." (Tr. 189). On October 10, 2002,[15] Dr. Macannuco noted that plaintiff's low back, neck and head pain was a "6 out of 10"; plaintiff described her pain as "burning, sharp, [and] shooting," with her worst area of pain being "right-sided thoracic pain." (Tr. 227). Plaintiff had been referred to Dr. Berliveau at the Hospital for Special Care, but plaintiff had not yet made an appointment. (Id.). Plaintiff's cervical spine x-ray was within normal limits and she was diagnosed as having myofascial spasms, for which she was prescribed a muscle relaxant. (Id.).

Dr. Macannuco saw plaintiff again on November 15, 2002, at which time plaintiff complained of pain in her low back, neck, and left arm, and described her pain as "burning and shock-like." (Tr. 226). Plaintiff also reported feeling very depressed and anxiety-ridden. (Id.). Dr. Macannuco diagnosed plaintiff with myofascial pain and referred her to Dr. Ruban to deal with the chronicity of her pain. (Id.).

On December 23, 2002, plaintiff had a consultation with Susan Rubman, Ph.D, at the Hospital for Special Care. (Tr. 237-39). Plaintiff reported that although her pain is "variable in intensity," it is "constant" and it "interferes with virtually all activities of daily living and sleep." (Tr. 237). Plaintiff also reported a forty pound weight loss ever since her gastric bypass surgery in August 2002, and attributed the majority of her sleep latencies to worry. (Id.). Dr. Rubman noted that plaintiff "endorses feelings of helplessness and limited hopelessness," was "dysphoric," and endorsed "significant

---

[15]On that same day, plaintiff underwent an initial physical therapy evaluation at the Bristol Hospital location of the Connecticut Spine and Pain Center. (Tr. 233-35). The evaluator noted that plaintiff has "chronic myofascial pain" in the C-spine and L-spine. (Tr. 235).

history of worry and rumination." (Tr. 238). Plaintiff reported a history of sexual abuse when she was younger, she revealed having been in abusive relationships in the past, and she reported previous psychiatric intervention. (Id.). Dr. Rubman's diagnosis was "[m]ajor depression, moderate, recurrent" and Dr. Rubman noted that plaintiff "may benefit from additional or alternative pharmacotherapy" but that it was unlikely that medication alone would resolve plaintiff's mood issues." (Id.). According to Dr. Rudman, plaintiff "appeared to meet diagnostic criteria for a major mood disorder." (Tr. 239).

On January 16, 2003, plaintiff saw Dr. Macannuco (Tr. 231-32), who noted that plaintiff had "some lumbar paraspinous spasms" and that she was "[a]mbulating non-antalgically." (Tr. 231). Plaintiff was instructed to increase her dosage of Topamax. (Tr. 232). Plaintiff was seen again by Dr. Macannuco on February 6, 2003, at which appointment plaintiff complained of increased left leg pain that was "shooting and aching." (Tr. 188).[16] Dr. Macannuco discussed plaintiff's "non-compliance with physical therapy" as part of her treatment plan and said that plaintiff "agrees she will be more compliant." (Id.). Dr. Macannuco diagnosed plaintiff with lumbar neuritis/lumbar facet joint arthralgia and myofacial pain. (Id.).

On February 11, 2003, plaintiff was seen for outpatient follow-up by Dr. Rubman. (Tr. 236). Cognitive behavioral therapy was instituted and the session focused on the importance of establishing regular out of home activities and "limit setting" with her children. (Id.). Dr. Rubman observed that plaintiff was engaged in very few recreational or reinforcing activities and that issues with her children increased her stress and contributed to her mood swings. (Id,). Dr. Rubman noted that plaintiff had been unable

---

[16]Plaintiff reported to Dr. Macannuco that she "is currently seeing Dr. [Rubman] for her depression and anxiety. . . ." (Tr. 188).

to actually participate in the physical therapy program prescribed. (Id.).  Dr. Rubman prescribed 60 mg of Prozac.  (Id.).[17]

On May 20, 2003, plaintiff was seen by Dr. Robert Belniak of Grove Hill Medical Center Orthopaedic Surgery & Sports Medicine Physiatry.  (Tr. 213).  Plaintiff informed Dr. Belniak that she had a previous history of right knee arthroscopy due to a torn meniscus, and chronic pain in her left knee which had worsened after she twisted it recently.  (Id.).  He noted that plaintiff had an effusion in the left knee, her left knee was markedly tender over the medial joint line, she had a positive McMurray's sign, she had limited flexion due to her swelling and pain, and she had a torn medial meniscus.  (Id.). On June 23, 2003, Dr. Belniak performed an arthroscopic partial medial and lateral meniscectomy on plaintiff's left knee.  (Tr. 213, 267-82, 313).  On September 19, 2003, plaintiff was seen by Dr. Van Nieuwenhuizc for elevated blood pressure, and heart palpitations, which he monitored.  (Tr. 290).

Dr. Yunus Pothiawala of Connecticut Disability Determination Services saw plaintiff for a Psychiatric Evaluation for SSA on September 26, 2003 (Tr. 240-42), during which plaintiff reported that she has "a lot of physical problems," and emotionally she feels "drained and depressed."  (Tr. 240).  Plaintiff revealed that her first psychiatric contact

---

[17]On May 19, 2003, plaintiff was interviewed by telephone by SSA for her underlying application for benefits.  (See Tr. 69-71).  The interviewer noted that plaintiff "sounded fatigued." (Tr. 70).

Eight days later, Dr. Raphael Cooper from the New Britain Urological Group submitted a Disability Determination to Connecticut Disability Determination Services.  (Tr. 212).  Dr. Cooper noted that plaintiff had some lower back problems and had undergone lumbar disc surgery with Dr. Zucker in 1992, and was using a TENS unit for her chronic back pain.  (Id.).  He also noted that plaintiff had suffered from moderate stress urinary incontinence in 1992, and that this condition was slowly improving.  (Id.).  Dr. Cooper stated that plaintiff "dropped from follow-up" at his office from September 1992 until March 30, 1998, and then again from April 1998 until May 29, 2002, which was her last appointment with him.  (Id.).

was when she was eighteen years old, when she had cut herself while feeling depressed; she was hospitalized at New Britain General Hospital for about two weeks.  (Id.).  At the time, she was being seen by a therapist and APRN on a weekly basis and was on 60 mg of Prozac daily.  (Tr. 240-41).   Dr. Pothiawala described plaintiff's mental status as follows: moderately despondent as well as mildly anxious, low self-esteem and feelings of helplessness and uselessness, functioning at about an average intelligence, fairly well oriented in all spheres, clear sensorium, fair memory, fair judgment, decreased attention span and concentration abilities, no signs of overt psychosis, no active suicidal or homicidal ideations, and no findings suggestive of overt organic brain syndrome.  (Tr. 241).   Dr. Pothiawala opined that plaintiff suffered from dysthymia secondary to her physical problems, that "[o]ne . . . has to rule out the possibility of major depressive disorder as a differential diagnosis" and that she would be able to "manage funds on her own behalf."  (Tr. 242).  Additionally, Dr. Pothiawala noted that plaintiff "appeared to be in physical discomfort," and she presented with a "depressed affect."  (Tr. 241).

Plaintiff was examined at the Bristol Hospital emergency room on October 1, 2003, where she complained of a migraine headache and nausea.  (Tr. 294-96). On that same day, a vocational analysis Summary Form was completed by Shannon Simmons for SSA.  (Tr. 112-25).  Simmons concluded that plaintiff is "limited to light work" and she cannot perform her past work, but she can be expected to adjust to unskilled light work such as an assembler of small parts, a cashier, or a laundry folder.  (Tr. 112).  Simmons concluded that plaintiff was not disabled.  (Id.).

Two days later, a Disability Determination and Transmittal was conducted by Drs. Maria Lorenzo and Jose Santos for SSA, which reflects that "[t]here is sufficient evidence

to support the findings regarding [Residual Functional Capacity] ["RFC"][18] at Step 5."  (Tr. 467; see also Tr. 258-66).    Dr. Lorenzo concluded that plaintiff could occasionally lift and/or carry twenty pounds frequently, lift and/or carry ten pounds, stand, walk, or sit about six hours in an eight-hour day and occasionally climb, balance, stoop, kneel, crouch and crawl.  (Tr. 259-63).  She noted evidence of degenerative joint disease of the left spine and left knee, a possible torn meniscus of the left knee, and fibromyalgia.  (Tr. 263).  Dr. Lorenzo opined that plaintiff could perform light work.  (Id.).  Dr. Lorenzo referred plaintiff to a "mental impairment consultant."  (Tr. 266).

Four days later, on October 7, 2003, an Adult Mental Impairment Summary Form was completed by Dr. Belniak, in which plaintiff's conditions were listed as depression, chronic fatigue, fibromyalgia, and irritable bowel syndrome.  (Tr. 255).  Dr. Belniak found plaintiff despondent and mildly anxious.  (Id.).  According to Dr. Belniak, plaintiff had a depressed affect, decreased attention and concentration spans, a fair memory, and dysthymia. (Id.).

An echocardiogram report completed by Dr. Morgan Werner on October 15, 2003 reflected that everything was "[n]ormal with physiological trace TR."  (Tr. 316).  Two days later, on October 17, 2003, plaintiff was seen at the New Britain General Hospital emergency room, with chief complaints of suicidal thoughts and depression.  (Tr. 297-311).  Plaintiff stated, "I tried to hurt myself; I need to see someone."  (Tr. 302).  She had superficial lacerations on her wrist, and her mental status was described as "tearful."  (Tr. 301-07).  Plaintiff admitted using alcohol, marijuana, tobacco and cocaine at one

---

[18]SSA defines "residual functional capacity" as follows: "Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting. Your residual functional capacity is what you can still do despite your limitations." 20 C.F.R. § 416.945(a).

time or another, although plaintiff stated that she had ingested only alcohol on that particular day.  (Tr. 307).   Plaintiff was referred by Behavioral Health Services to Julie Follett, APRN, for outpatient therapy.  (Tr. 310).

Follett completed a Mental Status Questionnaire of plaintiff for DDS on December 29, 2003, in which she stated that she had first seen plaintiff on May 19, 2003 and had last seen her, as of that date, on December 18, 2003.  (Tr. 317-19).  She described plaintiff as having stabilized emotionally since treatment had begun, and noted that "physically, [her] condition varies."  (Tr. 317).  Follett noted that plaintiff was "usually well groomed and appropriately attired" and that, while she is "alert [and] oriented," she has "[p]oor concentration[,] [s]hort term memory deficits[,] [and] [o]ften cannot finish sentences."  (Tr. 318).  Follett also noted that there was "no evidence of psychosis," but described plaintiff's mood as being "[d]epressed" and "[b]lunted."  (Id.).  According to Follett, plaintiff has an "[e]xcellent relationship with her parents," has "some supportive female friends", and "[e]xcellent social skills with [the] general public."  (Id.).  However, Follett noted that plaintiff's ability "to perform ADL's varies with level of pain [and] joint stiffness," and that she has a "[v]ery poor ability to organize [and] complete tasks."  (Tr. 318-19).   Finally, Follett expressed concern "about risk for self harm with [increased] stress."  (Tr. 319).  Follett's assessment was co-signed by Dr. Peter Radasch, Psy.D.  (Id.). On the same day, Dr. Feinglass noted that plaintiff was being treated for fibromyalgia and lumbosacral spondylosis, and "[a]s is often the case, her fibromyalgia is associated with other problems, specifically headache which has been intractable and severe mood problems with depression."  (Tr. 320).  Dr. Feinglass opined that she will not be able to perform work of any kind.  (Id.).

16

Plaintiff was seen in the University of Connecticut Neurology Clinic by Dr. Jennifer Jones and Dr. Leslie Wolfson on December 30, 2003.  (Tr. 433-34).  Her first complaint was of migraines, which she said had been occurring once a month for fourteen years, associated with her periods, lasting one to three days each.  (Tr. 433).  According to plaintiff, the migraines caused nausea, vomiting, and photophobia.   (Id.).  Plaintiff's second complaint was lumbar back pain that originated when she had a discectomy ten years prior, after which she experienced a left-sided foot drop.  (Id.).  Plaintiff's blood pressure was elevated at 150/110 and it was noted that she was "awake, alert and oriented," and that her language was fluent.  (Tr. 434).  Her motor exam showed "no drift in the upper extremities" and strength was 5/5 in all muscle groups in the upper and right lower extremities, and 4+/5 in the left dorsiflexors.  (Id.).  Plaintiff's reflexes were a 2+/4 in the upper extremities, 2+in the knees, and a 2 in the right Achilles; the left Achilles was "absent".  (Id.).  Her gait was independent and steady, and Romberg was negative.  (Id.).  Dr. Wolfson stated that she saw no signs of a myelopathy or additional weaknesses and suggested no imaging.  (Id.).  Plaintiff was given samples of triptans, including Frova, Relpax and Axert.  (Id.).

On January 21, 2004, plaintiff's Physical Residual Functional Capacity Assessment was completed for SSA by Dr. Antonia Maningas (Tr. 321-30), who found that plaintiff could occasionally lift and/or carry up to twenty pounds, could frequently lift and/or carry up to ten pounds, could stand, walk and/or sit for about six hours in an eight hour workday, and had unlimited ability to push and pull with her hands and legs.  (Tr. 322). Dr. Maningas noted that plaintiff suffered from fibromyalgia and chronic lower back pain, and that alcohol, cocaine, and opiates were found in her bloodstream.  (Tr. 323).  Plaintiff

has occasional postural limitations with climbing, balancing, stooping, kneeling, crouching and crawling, and has no manipulative, visual or communicative limitations. (Id.).

In a Mental Residual Functional Capacity Assessment completed for SSA on February 2, 2004 (Tr. 331-51), Dr. Thomas M. Hill indicated that plaintiff was "moderately limited" in her ability to understand, remember and carry out detailed instruction, to maintain attention and concentration for extended periods, to complete a normal work week without interruptions from psychologically based symptoms, and to set realistic goals or make plans independently of others. (Tr. 331-32). According to Dr. Hill, plaintiff was not significantly limited in her ability to remember locations and work-like procedures, to understand and remember detailed instructions, to perform activities with a schedule and to be punctual without special supervision, to work in coordination with or proximity to others without being distracted by them, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to adhere to basic standards of neatness and cleanliness, to respond to changes in the work setting, to be aware of normal hazards and take precautions, and to travel in unfamiliar places or use public transportation. (Id.). Dr. Hill characterized her as having "major depression" that is recurrent and moderate, and he described her psychological allegations as "credible." (Tr. 333, 336, 340). Further, in the Psychiatric Review Techniques, Dr. Hill noted that an RFC assessment was necessary as plaintiff suffered from physical impairments co-existent with § 12.04 Affective Disorders: major depressive, recurrent moderate, and § 12.06 Anxiety-Related Disorder: history of PTSD. (Tr. 337, 340, 342). Specifically, according to Dr. Hill, plaintiff's "major depression

18

recurrent moderate" is characterized by sleep disturbance, decreased energy, difficulty concentrating or thinking, and thoughts of suicide. (Tr. 340). Plaintiff has mild functional limitations in conducting activities of daily living and in maintaining social functioning. (Tr. 347). She has moderate functional limitations in maintaining concentration, persistence or pace and has experienced one of two "[e]pisodes of [d]ecompensation, [e]ach of [e]xtended [d]uration." (Id.).

On July 1, 2004, plaintiff saw Dr. Versland, with symptoms of abdominal bloating, episodic lower abdominal cramps and frequent bowel movements. (Tr. 454). Dr. Versland noted that plaintiff had initially lost sixty pounds after gastric bypass surgery, but had begun to gain weight over the past four to six months. (Id.). He suspected that plaintiff's symptoms were related to "a combination of irritable bowel that has been aggravated by her gastric surgery with its resulting, expected malabsorption . . . further aggravated by the amount of food she is eating." (Id.). Dr. Versland noted that plaintiff will "cut back on her caloric intake" and that he would see her again after she tried to take Flagyl 150 mg. three times per day. (Id.). Dr. Versland noted his consideration of re-biopsying the colon to be sure that plaintiff did not have inflammatory bowel disease. (Id.).

On August 25, 2004, Dr. Versland noted that "[a] trial of Flagyl had no effect on [plaintiff's] symptoms," and that she continued to have bloating and lower abdominal discomfort and some diarrhea. (Tr. 453). Dr. Versland also noted that plaintiff "continues to gain weight" which he suspected was due to the number of calories she was consuming. (Id.). Dr. Versland planned to repeat a colonoscopy to see if plaintiff had evidence of inflammatory bowel disease that could be contributing to her symptoms.

(Id.).  Plaintiff's colonoscopy and biopsy, conducted on September 1, 2004 (Tr. 435-52), showed that she had a "normal colon to cecum with the exception of hemorrhoids. . . ." (Tr. 435-52).  Subsequent biopsies of the right and left colon showed that "[e]osinophils and a few lymphocytes are present within the surface epithelium but they are not present in the numbers that would warrant a diagnosis of microscopic colitis."  (Tr. 436, 451).

On November 4, 2004, Dr. Feinglass completed a Medical Source Statement of Ability To Do Work-Related Activities for SSA.  (Tr. 402-08).  According to Dr. Feinglass, plaintiff's ability to understand, remember and carry out instructions is "[p]ossibly affected by her depressed mood . . ." (Tr. 402), and her ability to interact appropriately with the public, supervisors and co-workers, and to respond appropriately to work pressures and charges was moderately impaired due to her "horrible" mood, daily headaches, and poor sleep.  (Tr. 402-03).  Dr. Feinglass concluded that plaintiff can occasionally lift and/or carry less than ten pounds, and that she could stand and/or walk for less than two hours in an eight-hour workday.  (Tr. 405).  According to Dr. Feinglass, plaintiff was able to sit for about six hours in an eight hour workday, and her pushing and/or pulling was "modestly/mildly limited" in her upper and lower extremities.  (Tr. 406).  Further, plaintiff was never able to perform postural activities such as climbing (ramps, stairs, ladders, etc.), balancing, kneeling, crouching, or crawling, and plaintiff could occasionally stoop and perform manipulative functions such as reaching all directions (including overhead) and handling (gross manipulation), although her limitations are due to tingling in her hands and pain in her shoulder.  (Tr. 406-07).  Dr. Feinglass noted that temperature extremes, noise, dust, vibration, humidity and wetness, hazards (including machinery and heights), and fumes, odors, chemicals and gases

"[e]xacerbate[d] multiple symptoms."  (Tr. 408).   Plaintiff showed no signs of having visual or communicative limitations.  (Tr. 407).

On November 14, 2004, Follett completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical and Mental) for SSA (Tr. 132-38), in which she concluded that plaintiff could occasionally and frequently lift or carry less than ten pounds, could stand and/or walk less than two hours in an eight-hour work day, and needed to periodically alter sitting and standing, had limited pushing/pulling ability in her upper and lower extremities, can never climb, balance, kneel, crouch, crawl or stoop, could only occasionally reach, handle, finger and feel, was limited in her speech due to fatigue and stress, and her exposure to temperature extremes, noise, dust, vibration, humidity, hazards, and fumes needed to be limited.  (Tr. 132-35).  Follett stressed that plaintiff's conditions "change[d] from day to day" and "[a]ny sustained action or position beyond a few minutes cause[d] discomfort."  (Tr. 133).  Further, she noted that plaintiff's depression was "severe and recurrent" often with suicidal ideation.  (Tr. 134).

In her assessment of plaintiff's mental abilities, Follett concluded that plaintiff was slightly limited in her ability to understand, remember, and carry out short, simple instructions, was markedly limited in her ability to understand, remember, and carry out detailed instructions, and moderately limited in her ability to make judgments on simple work-related decisions.  (Tr. 136).  Follett noted that plaintiff had a short term memory deficit, and plaintiff was "[e]asily overwhelmed by complex instructions."  (Id.).  Further, according to Follett, plaintiff was markedly limited in her ability to respond appropriately to work pressures or changes in a usual or routine work setting.  (Tr. 137).  Plaintiff had "[w]ord finding difficulty," had difficulty with manual dexterity and ambulation, and

"experience[d] severe fatigue, pain [and] depression," sometimes resulting in "acute illness confining her to bed." (Id.).[19]

On November 10, 2005, Dr. Radasch completed a Medical Source Statement of Ability To Do Work-Related Activities (Mental) of plaintiff.  (Tr. 538-40).  He noted that plaintiff's ability to understand, remember and carry out short, simple instructions was moderately restricted, and that her ability to understand and remember detailed instructions and to make judgments on simple work-related decisions was markedly restricted. (Tr. 538).    Further, plaintiff's ability to carry out detailed instructions was extremely restricted.  (Id.).  Plaintiff was "unable to do serial sevens" and her recall was "one out of three after 60-120 seconds."  (Id.).  She was "[u]nable to prioritize tasks without assist[ance]" and required one-on-one assistance to complete written forms. (Id.).  Dr. Radasch noted that plaintiff's "[s]ignificant word finding deficit" resulted in her inability to be verbally articulate, that her "[s]hort term memory deficit" resulted in her unreliability in adjusting to new material, and that her "[c]hronic pain [and] fatigue" resulted in her inability to "attend [the] workplace consistently or predictably."  (Tr. 539). Dr. Radasch noted: "Remember: This individual successfully completed nursing program and hairdressing program prior to onset fibromyalgia." (Tr. 538)(emphasis omitted). According to Dr. Radasch, plaintiff's ability to interact appropriately with the public was slightly affected, her ability to respond and interact appropriately with supervisors and co-workers was moderately affected, and her ability to respond appropriately to changes in a routine work setting and to work pressures in a usual work setting was extremely

_____

[19]In her March 4, 2005 submission to SSA regarding her recent medical treatment, plaintiff noted she had right hand carpal tunnel surgery on February 19, 2005 performed by Dr. Belniak; these records are not in the administrative record.  (Tr. 510).

affected.  (Tr. 539).  Dr. Radasch noted that plaintiff's diagnosis had been "[m]ajor depressive disorder," although recently she was reevaluated and diagnosed as having Bipolar II Disorder, characterized as causing "major recurrent depressive episodes [with] hypomanic episodes."  (Id.).  Dr. Radasch reported that the "impact of this disorder combined with fibromyalgia results in severe deficits."  (Id.).  The medical and clinical findings supporting Dr. Radasch's assessment included plaintiff's "[s]truggle[] to speak in full sentences at times," her need for "written reminders for any change in medication or routine," her need for "extensive prompting to recall issues that [were] discussed in prior session[s]," and her inability "to make 30-50% [of her appointments] due to acute pain [and] stiff joints."  (Id.).  Finally, Dr. Radasch opined that plaintiff could manage benefits in her best interest "[p]rovided [her] parents remain involved for some coaching or financial decisions."  (Tr. 540).

On November 14, 2005, Dr. Gerson M. Sternstein completed a Medical Source Statement of Ability To Do Work-Related Activities (Physical) for SSA.  (Tr. 583-86).  According to Dr. Sternstein, plaintiff could frequently lift and/or carry less than ten pounds at a time.  (Tr. 583).  She could stand and/or walk for at least two hours in an eight-hour day, and periodically needed to alternate sitting and standing to relieve pain or discomfort.  (Tr. 583-84).  Her ability to pull and push with her upper and lower extremities was affected by her impairments, which Dr. Sternstein found included fibromyalgia and neuropathic pain.  (Tr. 584).  Plaintiff was limited in her ability to climb, balance, kneel, crouch, crawl or stoop stemming from her "weakness, poor flexibility and risk for exacerbation of symptoms" if she exerted energy past her limits.  (Id.).  As for plaintiff's manipulative functions, her ability to reach all directions was limited, while her

handling (gross manipulation), fingering (fine manipulation) and feeling (skin receptors) were unlimited.  (Tr. 585).  Plaintiff did not have any limitations regarding her seeing, hearing, or speaking, although "cold weather and changes in humidity and pressure [could] cause escalation of pain and limit mobility throughout [plaintiff's] joints."  (Tr. 585-86).

Plaintiff was a patient of Follett from May 19, 2003 to November 3, 2005 at Hart Times Counseling.  (Tr. 541-81).  In Follett's counseling notes, she observed plaintiff's "cognitive difficulties," her fibromyalgia, her back pain and her pain in her extremities. (Tr. 541).  Plaintiff discussed her abusive relationship with her husband, her history of sexual abuse, the multiple stressors in her life, and her depression.  (See Tr. 544-45, 553-54, 568, 570-71).  Plaintiff reported to Follett that she is in a lot of pain, despite taking several pain medications regularly.  (Tr. 553, 555, 565, 577).  Follett noted her "word finding difficulty" and the fact that plaintiff was "forgetting a lot of things."  (Tr. 557).  On some visits she was "tearful," "feeling hopeless," crying, feeling very depressed, "disgusted," and "discouraged."  (Tr. 559, 567).  In December 2004, plaintiff considered helping watch a friend's children because she could use the money, but she decided that she was "not well enough to take on this job" as she was tired, sore, not walking well, had decreased mobility, decreased strength and decreased balance.  (Tr . 569).

In a letter, dated September 15, 2004, Follett described plaintiff's need for pain management for her fibromyalgia, and her diagnoses of PTSD and Major Depressive Disorder, moderate recurrent.  (Tr. 563).  Follett noted that plaintiff had been "stable" but there had not been a "very satisfactory response to antidepressant therapy."  (Id.).

24

On March 17, 2005, Follett noted that plaintiff was in urgent need of her Cymbalta, without which she was at a high risk for a relapse.  (Tr. 575).  Follett noted plaintiff had chronic severe pain, and intermittent depression, both of which improved dramatically with Cymbalta, and in the past, plaintiff experienced suicidal ideation and increased anxiety.  (Id.).

On August 4, 2005, Follett noted that plaintiff's moods were up and down and that Dr. Sternstein had diagnosed her with Bipolar II disorder.  (Tr. 580).  Plaintiff was having panic attacks and visual disturbances, and she was involved in a biweekly pain medication group to alleviate the increased physical pain.  (Id.).  Three months later, on November 3, 2005, plaintiff superficially cut her wrist again, but denied feeling suicidal. (Tr. 581).

Coinciding with plaintiff's treatment with Follett, plaintiff was seen regularly in 2005 at Paragon Behavioral Health, which treatment was overseen by Dr. Sternstein. (See Tr. 587-98, 516).    At her initial intake on January 24, 2005, plaintiff appeared depressed and anxious, with an impaired memory.  (See Tr. 587-89).  Her depression was characterized as "moderate," and she reported "mild" panic attacks.  (Tr. 590). Throughout her visits, plaintiff reported her pain, anxiety, depression, and panic, for which her medication regime was routinely evaluated.  (See Tr. 592-98).  On March 3, 2005, Dr. Sternstein verified that plaintiff was being treated at Paragon for Major Depressive Disorder, single episode, moderate; post-traumatic stress disorder; and pain disorder due to a medical and psychiatric condition.  (Tr. 516).

On March 7, 2005, plaintiff, with the assistance of counsel, testified at her first hearing before ALJ Burlison.[20]   (See Tr. 44-48, 52-54, 469-72, 473-78).   On June 19, 2005, ALJ Burlison issued her decision denying plaintiff's claim, and on September 1, 2005, the Appeals Council vacated and remanded the case.  (Tr. 481-83, 498-501).   A second hearing was held before ALJ Burlison on November 16, 2005.  (See Tr. 599-622).

At plaintiff's November 16th hearing, she testified that she saw Follett once a week for treatment of her depression and PTSD, and she saw Dr. Sternstein once every two weeks for pain management.  (Tr. 610-12).  Additionally, she saw her orthopedist, Dr. Belniak, and her rheumotologist, Dr. Feinglass.  (Tr. 612, 619).  According to plaintiff, her fibromyalgia caused "extreme fatigue," and "aching pain" in her arms, neck, shoulder, legs and back, making her feel like she had the flu all of the time.   (Tr. 613).  Additionally, she testified abut her "[s]ignificant" problems with her memory, and her inability to find the right words.   (Id.).   In addition to undergoing a course of pain management, as mentioned above, she took pain medications, including Percocet and Oxycontin, for her degenerative disk disease and for the fibromyalgia, sometimes as often as ten times a day.  (Tr. 614).  Plaintiff used Lidocaine patches for pain relief and took Demerol, Relpax, Phenergan, and Topamax for her migraines. (Tr. 615-17).  As a result of her physical impairments, she could only walk for about ten minutes before her legs and back hurt, and after about one-half-hour, she had to recline from a seated position. (Tr. 618).   She needed assistance dressing and opening the vials of her medications, and it was painful to pick up a gallon of milk.  (Tr. 618-19).

---

[20]There is no hearing transcript of the March 7, 2005 hearing before ALJ Burlison.  (See Dkt. #21, at 12).

### III.  STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry.  First, the court must decide whether the Commissioner applied the correct legal principles in making the determination.   Second, the court must decide whether the determination is supported by substantial evidence.  See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)(citation omitted).  Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998)(citation omitted).  The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact.  See Gonzalez v. Apfel, 23 F. Supp.2d 179, 189 (D. Conn. 1998)(citation omitted); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)(citations omitted). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner.  See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993)(citation omitted).   Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings.  See id.  Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise.  See 42 U.S.C. § 405(g); see also Beauvoir v. Charter, 104 F.3d 1432, 1433 (2d Cir. 1997)(citation omitted).

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits.  See  42 U.S.C. § 423(a)(1)(E).  "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of a medically

determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

Determining whether a claimant is disabled requires a five-step process.  See 20 C.F.R. § 404.1520.   First, the ALJ must determine whether the claimant is currently working.  See 20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is currently employed, the claim is denied.  See  20 C.F.R. § 404.1520(b).  If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied.  See 20 C.F.R. § 404.1520(c).  If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"].  See 20 C.F.R. § 404.1520(d); Bowen v. Yuckert, 482 U.S. 137, 141 (1987); Balsamo, 142 F.3d at 79-80.  If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled.  See 20 C.F.R. § 404.1520(d); see also Balsamo, 142 F.3d at 80.  If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work.  See 20 C.F.R. § 404.1520(e)-(f).  If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work.  See Balsamo, 142 F.3d at 80 (citations omitted).  Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. See 20 C.F.R. § 404.1520(f); see also Balsamo, 142 F.3d at 80 (citations omitted).

The Commissioner may show a claimant's Residual Functional Capacity ["RFC"] by using the Medical-Vocational Guidelines set forth in the SSA Regulations ["the Grid"].  See 20 C.F.R. § 416.945(a)(defining "residual functional capacity" as the level of work a claimant is still able to do despite his or her physical or mental limitations).  The Grid places claimants with severe exertional impairments, who can no longer perform past work, into employment categories according to their physical strength, age, education, and work experience; the Grid is used to dictate a conclusion of disabled or not disabled. A proper application of the Grid makes vocational testing unnecessary.

However, the Grid covers only exertional impairments; nonexertional impairments, including psychiatric disorders, are not covered.  See 20 C.F.R., Part. 404, Subpart P, App. 2, 20 C.F.R. § 200.00(e)(1).  If the Grid cannot be used, i.e., when nonexertional impairments are present or when exertional impairments do not fit squarely within Grid categories, the testimony of a vocational expert is generally required to support a finding that employment exists in the national economy which the claimant could perform based on his residual functional capacity.  See Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)(citing Bapp v. Bowen, 802 F.2d 601, 603 (2d Cir. 1986)).

## IV.  DISCUSSION

Following the five step evaluation process, ALJ Burlison found that plaintiff has not engaged in any substantial gainful activity since May 28, 2002, the alleged onset of her disability.  (Tr. 18; see 20 C.F.R. § 404.1520(a)(4)(ii) & (b)).  ALJ Burlison then concluded that the medical evidence supports a finding that the claimant has severe impairments, including degenerative joint disease of the knees with status post right and left knee arthroscopies and partial medial meniscectomies, degenerative disc disease of the lumbar

spine with history of discectomy in 1992, fibromyalgia,[21] mild obesity with gastric bypass, and major depression, recurrent and moderate.  (Tr. 19; see 20 C.F.R. § 404.1520(c)).[22]

In the third step of the evaluation process, ALJ Burlison concluded that plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments found in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 19; see 20 C.F.R. § 404.1520(d)).   ALJ Burlison found that "[n]o treating or examining physician has mentioned findings identical to or equivalent in severity to the criteria of any listed impairments," and that while plaintiff's medically determinable impairments "could reasonably be expected to produce the alleged symptoms," her statements concerning the intensity, persistence and limiting effects of these symptoms "are not entirely credible." (Tr. 20).  In addition, the ALJ found that plaintiff has the RFC to: lift/carry up to ten pounds occasionally, sit up to six hours and stand/walk up to two hours in an eight hour workday with occasional bending, stooping, climbing, pushing/pulling, crouching, crawling and kneeling, but with no repetitive overhead reaching.  (Id.).  ALJ Burlison concluded that plaintiff is limited to sedentary work.[23]  (Tr.

---

[21]ALJ Breton noted that, "while [plaintiff] is diagnosed with fibromyalgia her symptoms are not found to be consistent with those associated with fibromyalgia as she has few trigger points." (Tr. 22)(citations omitted).

[22]The ALJ concluded that plaintiff had been receiving treatment for gastro-esphageal reflux disease ["GERD"], irritable bowel syndrome and migraine headaches, but that "these conditions are generally controlled with medication and there is no evidence to indicate how these conditions limit her functional capacity." (Tr. 19). Further, the ALJ found that plaintiff's history of GERD, irritable bowel syndrome, and migraine headaches "are non-severe in nature as they no more than minimally impact her functional capacity." (Id.).

[23]Sedentary work is the least rigorous of the five categories of work recognized by the SSA Regulations, which include "very heavy," "heavy," "medium," "light," and "sedentary." See 20 C.F.R. § 404, Subpt. P, App. 2.  Sedentary work is defined as involving only occasional standing and walking, the lifting of no more than ten pounds at a time, and the occasional lifting and carrying of light objects.  See 20 C.F.R. § 404.1567(a).

22).   ALJ Burlison noted that in disability claims involving mental impairments, the assessment of the degree of functional limitations focuses on four broad functional areas: activities of daily living; social functioning; concentration, persistence or pace; and episodes of deterioration or decompensation in work or work-like settings.  (Id.).  The ALJ's review of plaintiff's psychiatric treatment history, including the Mental Residual Functional Capacity Assessments completed by the SSA physicians, led her to conclude that there was evidence of "B" criteria, but no evidence of "C" criteria[24] based on mental impairments of major depression.  (Tr. 23).[25]  ALJ Burlison wrote: "This finding is being given controlling weight as to the [plaintiff's] mental functioning, as there is nothing in the record to contradict this view." (Id.).  The ALJ noted that "[t]he [plaintiff] reports engaging in routine activities of daily living without difficulty," and "reports depression but does not require intensive psychiatric therapy other than medication management of her symptoms and monthly psychotherapy." (Dkt. #26).

In the fourth step of the evaluation, ALJ Burlison also considered the opinion evidence to see whether plaintiff could or could not perform her former work.  (Tr. 25; see 20 C.F.R. § 404.1520(e)-(f)).  The ALJ gave plaintiff's treating clinicians' opinions little weight because she found that they were based "solely on [plaintiff's] subjective

---

[24]"C" criteria would include evidence of plaintiff experiencing symptoms resulting in periods of decompensation of extended duration, an inability to function outside of a structured environment or an inability to function independently outside the area of her home.  ALJ Burlison noted that plaintiff "reported going out and she is compliant with therapy." (Tr. 23).

[25]ALJ Burlison noted that plaintiff's therapy records "do not indicate a marked degree of restriction in functioning," in that plaintiff had reported doing some hairdressing and piercing work in May 2003, was working part-time in February 2004 and had a "stable" condition in April 2004. (Tr. 22).  Furthermore, ALJ Burlison concluded that plaintiff's failure to report these instances of work activity "affects her credibility and indicates greater functional capacity than alleged." (Tr. 22-23).  The ALJ found it significant that plaintiff had testified and reported to no history of alcohol/drug abuse, yet a toxicology screen in October 2003 was positive for alcohol intoxication, cocaine and opiates.  (Tr. 23).

complaints" and lacked "supporting objective findings." (Tr. 25). The ALJ concluded that plaintiff was unable to perform any of her past relevant work as a licensed practical nurse or hairdresser, which require medium to light levels of exertion and the required ability to perform complex and detailed work tasks. (Dkt. #26). For the fifth and final step of the evaluation, ALJ Burlison concluded that plaintiff is "limited to the sedentary level of exertion" and has an "occupational base of unskilled sedentary work." (Tr. 22, 26; see 20 C.F.R. §§ 404.1520(g), 416.920(g); SSR 96-9p). The ALJ found that, based on plaintiff's age, education, work experience and RFC, there are jobs that exist in significant numbers in the national economy that plaintiff can perform, and therefore plaintiff is not under a "disability,"[26] as defined by the Social Security Act, at any time since her alleged onset of disability. (Tr. 26).

Plaintiff now seeks an order reversing the decision of the Commissioner on grounds that the ALJ made several crucial errors in the process of denying plaintiff's claim. (Dkt. #21, at 14-28). Plaintiff asserts that the ALJ improperly disregarded the opinions of the treating sources, especially those of Dr. Radasch, Dr. Feinglass, and Dr. Sternstein. (Id. at 18-24). Additionally, plaintiff argues that the ALJ misused the Medical-Vocational Guidelines to reach her conclusion that plaintiff is not disabled. (Id. at 24-26).

In response, the Commissioner concedes that the ALJ did not afford certain treating physicians' opinions controlling weight, but maintains that the weight actually afforded by the ALJ is reasonable in light of the factors listed in 20 C.F.R. § 404.1527(d)(2); that an ALJ may reject a treating physician's opinion as controlling when

---

[26]The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

it is not well supported by substantial evidence or inconsistent with other substantial evidence in the record, and that the ALJ properly found that some of the physicians' opinions were not well supported by medically acceptable clinical and laboratory diagnostic techniques.  (Dkt. #24, at 10-24).  Finally, the Commissioner argues that ALJ Burlison did not misuse the Medical-Vocational Guidelines, and vocational expert testimony is not required in every case involving non-exertional impairments as the testimony of an expert must be determined on a case-by-case basis.  (Id. at 21-23). ____

A. ALJ BURLISON'S CONSIDERATION OF TREATING PHYSICIANS' OPINIONS

Plaintiff claims that in her June 19, 2005 decision following the first hearing, ALJ Burlison "virtually discarded [plaintiff's] mental impairments as having 'little or no effect on the occupational base of unskilled sedentary work,'" and subsequently made an "unsupported finding that [plaintiff] has an RFC of sedentary work."  (Dkt. #21, at 15). More specifically, plaintiff claims that the ALJ did not give weight to the opinions of Drs. Feinglass and Sternstein (Tr. 402-08; 583-86), or to Dr. Radasch's statement that plaintiff had very poor ability to organize and complete tasks, and difficulty with increased stress. (Dkt. #21, at 18-24; Tr. 538-40).  Plaintiff further asserts that in "order[ing] the ALJ to consider the treating source rules and Rulings, and [to] explain the weight given to Dr. Radasch's opinion" the Appeals Council "recognized the ALJ's errors in not even noting the mental health treater's statement."  (Dkt. #21, at 18-19).  It is plaintiff's contention that after the plaintiff's second hearing, the ALJ "acknowledged what the Appeals Council had ordered her to do" but "without substantial evidence in the record, acting as her medical expert and outside the law, the ALJ rejected . . . Dr. Radasch's detailed explanation and conclusion[s]. . . ."  (Dkt. #21, at 20).

According to the Commissioner:

the Act generally requires an ALJ to give controlling weight to the opinion of a treating source as to the nature and severity of an impairment when the opinion 1) concerns the nature and severity of an impairment, 2) is well supported by medically acceptable clinical and laboratory diagnostic techniques, and 3) is not inconsistent with the other substantial evidence in the case record.

(Dkt. #24, at 10-11)(citations omitted).   The Commissioner continues that "the weight actually afforded is reasonable in light of the factors listed in 20 C.F.R. §§ 404.1527(d), 416.927(d), which must be considered in weighing a treating source's opinion that is not found to be controlling." (Id. at 11).  The Commissioner asserts that "by negative inference an ALJ may reject a treating physician's opinion as controlling when it is not well supported by substantial evidence or inconsistent with other substantial evidence in the record," and that the ALJ found that these opinions "were not well supported by medically acceptable clinical and laboratory diagnostic techniques, and were inconsistent with the other substantial evidence in the case record."   (Id. at 11, 13)(emphasis in original)(multiple citations omitted).

When making a determination regarding Social Security disability benefits, "[t]he opinion of a treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with the other substantial evidence."   Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999)(multiple citations omitted); see 20 C.F.R. § 404.1527 (d)(2)(when the ALJ "fiind[s] that a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence, . . . [the ALJ] will give it controlling weight."). "Generally, . . . more weight [is given] to opinions from . . . treating sources, since these sources are likely to be the

medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations . . . ."  20 C.F.R. § 404.1527(d)(2).  Moreover, "[g]enerally, . . . more weight [is given] to the opinion of a source who has examined [a claimant] than to the opinion of a source who has not examined [a claimant]."  20 C.F.R. § 404.1527(d)(1).

Plaintiff's medical records support her complaints of pain, fatigue and depression. In 2001, plaintiff underwent knee surgery that proved successful in alleviating her right knee pain, and two years later, plaintiff's left knee pain was alleviated with surgery.  (See Tr. 169-71, 186-87, 213, 267-82, 313).  However, her pain is not limited to her knees.  In 2002, plaintiff was first seen by Dr. Feinglass, her rheumotologist, who treated plaintiff's fibromyalgia. (See Tr. 199, 431-32).  While Dr. Feinglass noted that his "examination does not strongly support [a finding of fibromyalgia] in that no definite trigger points are identified," her symptoms and history were "certainly strongly suggestive . . . of fibromyalgia."  (Tr. 432).  Furthermore, documenting her back pain, x-rays performed by Dr. Feinglass revealed "[s]ignificant disc space . . . at 5-S1 and "[m]ild-to-moderate narrowing . . . at L4-5."  (Tr. 189, 285).  Two months after her consultation with Dr. Feinglass, plaintiff was seen by Dr. Macannuco of the Connecticut Spine and Pain Center, complaining of "[t]otal body pain."  (See Tr. 228-29).   In October 2002, plaintiff's low back, neck and head pain were a "6 out of a 10," and she was diagnosed as having myofascial spasms.  (Tr. 227).  During the course of her treatment with Dr. Macannuco, plaintiff's pain continued with "some lumbar paraspinous spasms" that caused plaintiff to

ambulate "non-antalgically," lumbar neuritis/lumbar facet joint arthralgia, and myofascial pain.  (Tr. 188, 231).

In October 2003, Dr. Maria Lorenzo reviewed plaintiff's medical records for SSA and concluded that plaintiff could perform light work as she can occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand, walk or sit about six hours in an eight hour day, and occasionally climb, balance, stoop, kneel, crouch and crawl.  (Tr. 258-64).   Similarly, Shannon Simmons completed a vocational analysis for DDS in which she concluded that plaintiff is "limited to light work."  (Tr. 112-25).   In January 2004, Dr. Maningas completed a Physical Residual Capacity Assessment for SSA in which he reached the same conclusions as Dr. Lorenzo regarding plaintiff's RFC.  (Tr. 321-28).[27]

However, in December 2003, Follett, an APRN with whom plaintiff has undergone therapy,[28] noted that "[p]hysically, [plaintiff's] condition varies," and her ability to "perform ADLs varies with [her] level of pain [and] joint stiffness."  (Tr. 317-18).  Her assessment was co-signed by Dr. Radasch.  (Tr. 319).  On the same day that Follett completed her questionnaire for SSA, Dr. Feinglass noted that "[a]s is often the case, [plaintiff's] fibromyalgia is associated with other problems, specifically headache which has been intractable and severe mood problems with depression."  (Tr. 320).  Consequently, Dr. Feinglass opined that plaintiff would not be able to perform work of any kind.  (Id.).

On November 4, 2004, Dr. Feinglass completed a Medical Source Statement of Ability To Do Work-Related Activities for SSA, in which, in contrast to the submissions of Drs. Lorenzo and Maningas, who have not examined or treated plaintiff, he opined that

---

[27]It is Dr. Maningas who noted that alcohol, cocaine and opiates were found in plaintiff's bloodstream.  (Tr. 323).

[28]See note 31 infra.

plaintiff can occasionally lift and/or carry less than ten pounds, can stand and/or walk for less than two hours in an eight hour day, is able to sit for about six hours in an eight hour day, and is never able to climb, kneel, crouch or crawl. (Tr. 402-08).  Dr. Feinglass also noted that plaintiff's ability to understand, remember, and carry out instructions is "[p]ossibly affected by her depressed mood," and her ability to interact appropriately with the public, supervisors, and co-workers and to respond appropriately to work pressures and changes is moderately impaired due to her "horrible" mood, daily headaches and poor sleep. (Tr. 402-03).

Ten days later, Follett completed a Medical Source Statement of Ability To Do Work-Related Activities (Physical) for SSA, in which she concluded that plaintiff can occasionally and frequently lift and/or carry less than ten pounds, can stand and/or walk less than two hours in an eight-hour day, must periodically alter sitting and standing, and can never climb, balance, kneel, crouch, crawl or stoop. (Tr. 132-35).  Furthermore, Follett opined that plaintiff was limited in her speech due to fatigue and stress.  (Tr. 134).  According to Follett, plaintiff's condition "changes from day to day" and "[a]ny sustained action or position beyond a few minutes causes discomfort." (Tr. 133).  Follett reported that plaintiff's depression was "severe and recurrent" often with suicidal ideation.  (Tr. 134).

One year later, in November 2005, Dr. Sternstein, plaintiff's treating pain specialist, completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) in which she assessed plaintiff's abilities consistent with the findings of Dr. Feinglass, Follett, and Dr. Radasch. (See Tr. 583-86).  Specifically, Dr. Sternstein opined that plaintiff could frequently lift and/or carry less than ten pounds at a time; she could stand and/or walk for

at least two hours in an eight-hour day, and periodically needed to alternate sitting and standing to relieve pain or discomfort; and plaintiff was limited in her ability to climb, balance, kneel, crouch, crawl or stoop stemming from her "weakness, poor flexibility and risk for exacerbation of symptoms." (Tr. 583-84).

In addition to the physical issues, plaintiff reported to Dr. Macannuco a history of depression and suicide attempts, as well as feeling "anxiety-ridden." (Tr. 226, 229). Consequently, Dr. Macannuco referred plaintiff to Dr. Rubman at the Hospital for Special Care to deal with the chronicity of her pain. (Tr. 226, 236-38). Dr. Rubman reported that although plaintiff's pain is "variable in intensity," it is "constant," and it "interferes with virtually all activities of daily living and sleep." (Tr. 237). Dr. Rubman noted that plaintiff "endorses feelings of helplessness and limited hopelessness," is "dysphoric," and endorses a "significant history of worry and rumination." (Tr. 238). Dr. Rubman diagnosed plaintiff with Major Depression, moderate recurrent, and noted that plaintiff "appeared to meet [the] diagnostic criteria for a major mood disorder." (Tr. 239).

In her May 19, 2003, telephone interview with SSA for her underlying application for benefits, the interviewer noted that plaintiff "sounded fatigued." (Tr. 70). Four months later, Dr. Pothiawala completed a psychiatric evaluation for SSA during which he concluded that plaintiff "appeared to be in physical discomfort," and that she presented with a "depressed affect." (Tr. 241). According to Dr. Pothiawala, plaintiff was moderately despondent as well as mildly anxious, with low self-esteem and feelings of helplessness and uselessness, and a decreased attention span and concentration abilities. (Id.). However, Dr. Pothiawala noted that plaintiff is fairly well oriented in all spheres, and had a fair memory and fair judgment. (Id.). He concluded that plaintiff suffered from dysthymia

secondary to her physical problems, and he noted that "[o]ne . . . has to rule out the possibility of major depressive disorder as a differential diagnosis." (Tr. 242).

Similarly, on October 7, 2003, Dr. Belniak, plaintiff's orthopaedist, reported to SSA in an Adult Mental Impairment Summary Form that plaintiff suffered from chronic fatigue, was despondent, mildly anxious, had a depressed affect, decreased attention and concentration spans, a fair memory and Dysthymia. (Tr. 255).

Consistent with these opinions submitted to SSA, on October 17, 2003, plaintiff was seen at the emergency room of the New Britain General Hospital complaining of suicidal thoughts and depression. (Tr. 297-311). During this visit, plaintiff admitted using alcohol, marijuana, tobacco, and cocaine, but stated that she only ingested alcohol on that particular day. (Tr. 307).

Two months after plaintiff's emergency room visit, Follett completed a Mental Status Questionnaire of plaintiff for SSA on December 29, 2003, which was co-signed by Dr. Radasch, in which she described plaintiff as having poor concentration, short term memory deficits, and a depressed and blunted mood. (Tr. 318-19). Further, according to Follett, plaintiff "[o]ften cannot finish sentences," and she has a "[v]ery poor ability to organize [and] complete tasks." (Id.).

In her November 14, 2004 Medical Source Statement of Ability To Do Work-Related Activities (Mental), Follett opined that plaintiff was slightly limited in her ability to understand, remember and carry out short, simple instructions, was markedly limited in her ability to understand, remember and carry out detailed instructions, and moderately limited in her ability to make judgements on simple work-related decisions. (Tr. 136). Follett noted that plaintiff had short term memory deficits, and plaintiff was "[e]asily

39

overwhelmed by complex instructions." (Id.).  Further, according to Follett, plaintiff was markedly limited in her ability to respond appropriately to work pressures or changes in a usual or routine work setting, and she had "word finding difficulty," difficulty with manual dexterity and ambulation, and experienced severe fatigue, pain and depression, sometimes resulting in acute illness confining her to bed.  (Tr. 137).

Consistent with Follett's assessment  and Dr. Feinglass' comments in 2003 and 2004,[29] Dr. Thomas Hill, a SSA examiner, opined in February 2004 that plaintiff was moderately limited in her ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to complete a normal work week without interruptions from psychologically-based symptoms, and to set realistic goals or make plans independently of others.  (Tr. 331-32). She was moderately limited in her ability to maintain concentration, persistence or pace, and she had one or two "[e]pisodes of [d]ecompensation, [e]ach of [e]xtended [d]uration."  (Tr. 347). However, according to Dr. Hill, plaintiff was not significantly limited in her ability to remember locations and work-like procedures, to understand and remember detailed instructions, to perform activities with a schedule and to be punctual, to work in coordination with others without being distracted, to get along with others, and to respond to changes in the work setting.  (Tr. 331-32).  That notwithstanding, Dr. Hill characterized

---

[29]In December 2003, Dr. Feinglass opined that as a result of "[plaintiff's] fibromyalgia [which] is associated with other problems, . . . [including] severe mood problems with depression," plaintiff will not be able to perform work of any kind.  (Tr. 320).

In November 2004, Dr. Feinglass noted that plaintiff's ability to understand, remember, and carry out instructions is "possibly affected by her depressed mood," and her ability to interact appropriately with the public, supervisors, and co-workers and to respond appropriately to work pressures and changes is moderately impaired due to her "horrible" mood, daily headaches and poor sleep.  (Tr. 402-03).

plaintiff as having Major Depression, recurrent moderate, and he described her psychological allegations as "credible." (Tr. 333, 340).   According to Dr. Hill, plaintiff's Major Depression was characterized by sleep disturbance, decreased energy, difficulty concentrating or thinking, and thoughts of suicide. (Tr. 340).

One year later, Dr. Radasch completed a Medical Source Statement of Ability To Do Work-Related Activities (Mental) of plaintiff in which he characterized plaintiff as moderately restricted in her ability to understand, remember and carry out short, simple instructions, markedly limited in her ability to make judgments on simple work-related decisions, and extremely restricted in her ability to carry out detailed instructions.   (Tr. 538). Dr. Radasch found plaintiff "[u]nable to prioritize tasks without assist[ance]," noted plaintiff's "[s]ignificant word finding deficit" and "[s]hort term memory deficit," and concluded that her "[c]hronic pain [and] fatigue" resulted in her inability to "attend [the] workplace consistently or predictably." (Tr. 538-39).   Emphasizing the limitations resulting from her fibromyalgia, Dr. Radasch remarked, "Remember: This individual successfully completed nursing program and hairdressing program prior to onset fibromyalgia." (Tr. 538)(emphasis omitted).   Dr. Radasch noted that plaintiff's diagnosis had been Major Depressive Disorder but she was recently reevaluated and diagnosed with Bipolar II Disorder.  (Tr. 539).

During the course of her treatment of plaintiff, Follett noted plaintiff's "word finding difficulty," the fact that plaintiff was "forgetting a lot of things," and that, on some visits she was "tearful," "feeling hopeless," crying, feeling very depressed, "disgusted," and "discouraged." (Tr. 557, 559, 567). While in September 2004, Follett noted that plaintiff had been "stable," she also noted that there has not been a "very satisfactory response to

antidepressant therapy." (Tr. 563). However, Follett also noted that plaintiff's chronic severe pain and intermittent depression both improved dramatically with Cymbalta. (Tr. 575). Coinciding with plaintiff's treatment with Follett, plaintiff was seen regularly in 2005 at Paragon Behavioral Health, which treatment was overseen by Dr. Sternstein. (See Tr. 587-98). Her depression was characterized as "moderate," and she reported "mild" panic attacks. (Tr. 590). Throughout her visits, plaintiff reported her pain, anxiety, depression, and panic, for which her medication regime was routinely evaluated. (See Tr. 592-98). On March 3, 2005, Dr. Sternstein verified that plaintiff was being treated at Paragon for Major Depressive Disorder, single episode, moderate; post-traumatic stress disorder; and pain disorder due to a medical and psychiatric condition. (Tr. 516).

Plaintiff's testimony that her fibromyalgia caused "extreme fatigue," and "aching pain" in her arms, neck, shoulder, legs and back, making her feel like she had the flu all of the time (Tr. 613), was supported by the above-referenced entries in the medical record, as was her testimony that she had "[s]ignificant" problems with her memory, and her inability to find the right words. (Id.). Additionally, plaintiff's medication routine substantiated her claims of constant pain as she took pain medications, including Percocet and Oxycontin, sometimes as often as ten times a day, and used lidocaine patches for pain relief, and took Demerol, Relpax, Phenergan, and Topamax for her migraines. (Tr. 614-17).

The opinions of Drs. Radasch, Feinglass, and Sternstein and even of two of the SSA examiners, Drs. Pothiawala and Hill, are consistent in concluding that plaintiff has Major Depression and has moderate to marked limitations in her ability to perform work-related activities. The ALJ has a duty to afford weight to these medical opinions, which are defined as "statements from physicians and psychologists or other acceptable medical

sources that reflect judgments about the nature and severity of [a claimant's] impairments . . . ."  20 C.F.R. § 404.1527(a)(2).[30]   Further, while Follett, a nurse practitioner,[31] is not included in the list of "acceptable medical sources," thus affording the ALJ's "discretion to determine what weight to give [Follett's] opinions based on all the evidence before [her]," Nichols v. Comm'r of Soc. Sec. Adm'n, 260 F. Supp. 2d 1057, 1066 (D. Kan. 2003), Follett's December 2003 assessment is co-signed by Dr. Radasch.  (Tr. 319).  As the Ninth Circuit observed in Gomez v. Chater, 74 F.3d 967, 971 (9th Cir.)(citation omitted), cert. denied, 519 US. 881 (1996), "[a] report of an interdisciplinary team that contains the evaluation and signature of an acceptable medical source is considered acceptable medical evidence. . . ."[32]

Plaintiff argues that in reaching her conclusion that plaintiff is able to perform sedentary work,[33] ALJ Burlison did not give controlling weight to these above-referenced treaters' opinions.  Dr. Feinglass opined that plaintiff retained a less than sedentary RFC as she could only  occasionally lift and/or carry less than ten pounds, was able to stand less than two hours in an eight hour day, and was able to sit for about six hours in an eight

---

[30]An "acceptable medical source" includes: 1) licensed physicians; 2) licensed or certified psychologists; 3) licensed optometrists; 4) licensed podiatrists; or 5) qualified speech-language pathologists. 20 C.F.R § 404.1513(a).

[31]Nurse practitioners are considered an "other source" under 20 C.F.R. § 404.1513(d)(1).

[32]The "mere co-signing of the report[, however,] does not create an interdisciplinary team within the meaning of the regulation." Nichols, 260 F. Supp. 2d at 1066.  There must be evidence in the record of "the evaluation of the acceptable medical source." Id. (emphasis in original)(footnote omitted).  There are no independent records from Dr. Radasch; however, Dr. Radasch completed a Medical Source Statement of Ability To Do Work-Related Activities (Mental) on November 10, 2005 for SSA.  (See Tr. 538-40).

[33]Sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a).  A sedentary job involves sitting and occasional walking and standing.  Id.

hour day.  (Tr 402-08).  Similarly, Follett, whose treatment was overseen by Dr. Radasch, reached the same conclusion but with the addition that plaintiff needed to periodically alter sitting and standing, and Dr. Sternstein's assessment was in agreement with that of Follett. (See Tr. 132-35, 583-86).

ALJ Burlison rejected these treating physicians' opinions by citing to the record's lack of objective evidence, and stating that these opinions were inconsistent with the findings of the State agency physicians.   (See Tr. 21-22).   While the Commissioner is correct that the Regulations permit the opinions of non-examining State agency physicians to override a treating source's opinion when they are supported by evidence in the record, Diaz v. Shalala, 59 F.3d 307, 313, n.5 (2d Cir. 1995), the opinions of the non-examining State agency physicians are not supported by evidence in the record.  Specifically, as the ALJ acknowledged, there is no evidence upon which the ALJ could rely to afford controlling weight to the opinions of the SSA examiners, Drs. Lorenzo and Maningas, and of the vocational analyst Shannon Simmons, that plaintiff could perform light work.  (See Tr. 22, 112-25, 258-66, 321-28).  However, in rejecting these opinions in favor of concluding that plaintiff could perform sedentary work, ALJ Burlison also rejected the treating physicians' opinions that plaintiff could perform less than sedentary work.  Specifically, despite Dr. Radasch's characterization of plaintiff as moderately restricted in her ability to understand, remember and carry out short, simple instructions, markedly limited in her ability to make judgments on simple work-related decisions, and extremely restricted in her ability to carry out detailed instructions (Tr. 538), and the degree of limitations opined by plaintiff's treating physicians Drs. Feinglass and Sternstein (see Tr. 320, 583-84), ALJ Burlison concluded that their opinions are not supported by the overall record. (See Tr. 25).   The

44

opinions of the treating physicians are entitled to more weight than the opinions of the examining State agency physicians, and are controlling as they are "well supported by medical findings and not inconsistent with the other substantial evidence."  Rosa, 168 F.3d at 78-79 (multiple citations omitted); see 20 C.F.R. § 404.1527 (d)(2).

If an ALJ does not give a treating physician's opinion controlling weight, the ALJ considers all of the following factors in deciding the weight assigned to any medical opinion:

> (i) the frequency of the examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004)(per curiam), citing 20 C.F.R. § 404.1527(d)(2).  Further, when an ALJ rejects a treating physician's opinion as controlling, he must "give good reasons in [his] notice of determination or decision for the weight [he] give[s] [plaintiff's] treating source's opinion," Halloran, 362 F.3d at 32 (citations & internal quotations omitted), and "an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." Rosa, 168 F.3d at 79.

In this case, ALJ Burlison rejected plaintiff's treating doctors' opinions by focusing on the lack of credibility she assigned to plaintiff's subjective complaints.[34]  ALJ Burlison stated that she gave "controlling weight" to the finding of the State agency's physicians'

---

[34]The Court notes that although the ALJ repeatedly remarks that plaintiff can perform activities of daily living, the record shows that while she goes shopping, she does so with her children as she is not able to carry groceries up three flights of stairs, her mother does the laundry for her and her children do all of the other household chores, her daughter opens her medication vials for her, and while she is capable of maintaining her own person hygiene, her daughter has to put her socks and shoes on for her and sometimes buttons plaintiff's shirt.  (Tr. 96, 229, 607-08, 618-19).

mental residual functional capacity assessment "as there is nothing in the record to contradict this view."   (Tr. 23).    This conclusion is reached despite Drs. Radasch, Sternstein and Feinglass' conclusions that plaintiff was incapable of performing the mental demands of work, which conclusions do contradict the findings of the State agency physicians.  Drs. Radasch, Sternstein and Feinglass, along with plaintiff's therapist, Follett, whose treatment is overseen by Dr. Radasch, all had continuous treatment relationships with plaintiff, were specialists in their fields, and offered opinions consistent with the others.   Furthermore, despite ALJ Burlison's repeated mention of plaintiff's lack of credibility regarding her subjective complaints,   Dr. Hill, the SSA examining physician, noted that plaintiff's psychological allegations were "credible."  (Tr. 333).  Accordingly, the ALJ erred in rejecting the treating sources' opinions and in concluding that plaintiff retained the RFC for sedentary work.

### B. USE OF THE MEDICAL-VOCATIONAL GUIDELINE WHEN SEVERE NON-EXERTIONAL IMPAIRMENTS EXIST

As stated above, the Commissioner may show a claimant's residual functional capacity by using the Grid, which places claimants with severe exertional impairments, who can no longer perform past work, into employment categories according to their physical strength, age, education, and work experience; the Grid is used to dictate a conclusion of disabled or not disabled.  See 20 C.F.R. § 416.945(a)(defining "residual functional capacity" as the level of work a claimant is still able to do despite his or her physical or mental limitations).   A proper application of the Grid makes vocational testing unnecessary. However, the Grid covers only exertional impairments; nonexertional impairments, including psychiatric disorders, are not covered.  See 20 C.F.R., Part 404, Subpt. P, App. 2, 20 C.F.R. § 200.00(e)(2).   If the Grid cannot be used, i.e., when nonexertional

impairments are present or when exertional impairments do not fit squarely within Grid categories, the testimony of a vocational expert is generally required to support a finding that employment exists in the national economy which the claimant could perform based on her residual functional capacity.   See Pratts, 94 F.3d at 39, citing Bapp, 802 F.2d at 603.  The determination of the necessity for expert testimony, however, is done on a case-by-case basis.  Bapp, 802 F.2d at 605.  Specifically,

> if a claimant's nonexertional impairments 'significantly limit the range of work permitted by [her] exertional limitations' then the [Grid] obviously will not accurately determine disability status because [it] fail[s] to take into account claimant's nonexertional impairments.   Accordingly, where the claimant's work capacity is significantly diminished beyond that caused by his exertional impairment the application of the [Grid] is inappropriate.

Id. at 605-06. The phrase "significantly diminish" is defined as the "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive [her] of a meaningful employment opportunity."  Id. at 606 (footnote omitted).

    In this case, ALJ Burlison concluded that if the plaintiff had the RFC to perform a full range of sedentary work, considering her age, education and work experience, a finding of "not disabled" would be directed by Medical-Vocational Rules 201.27 and 201.28. (Tr. 26).  The ALJ added, "[h]owever, the additional limitations have little or no effect on the occupational base of unskilled sedentary work (SSR 96-9p)."  (Id.).

    SSR 96-9p states:

> 1. An RFC for less than a full range of sedentary work reflects very serious limitations resulting from an individual's medical impairment(s) and is expected to be relatively rare.
>
> 2. However, a finding that an individual has the ability to do less than a full range of sedentary work does not necessarily equate with a decision of "disabled." If the performance of past relevant work is precluded

> by an RFC for less than the full range of sedentary work, consideration must still be given to whether there is other work in the national economy that the individual is able to do, considering age, education, and work experience.

Consistent with SSR 96-9p, it is vocational expert testimony that is necessary to determine whether there is other work in the national economy that an individual with the ability to do less than the full range of sedentary work may perform.   Moreover, the "additional limitations" to which the ALJ referred, i.e., plaintiff's pain, weakness, fatigue, Major Depression, poor concentration, memory deficits and word-finding difficulty, make-up precisely the "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity," so as to "significantly diminish" plaintiff's work capacity beyond that caused by her exertional impairments.   Accordingly, the application of the Grid is inappropriate, and the ALJ erred in not hearing vocational expert testimony at the second hearing.

In light of the conclusions reached Sections IV.A-B supra, this matter is remanded for the purpose of calculating benefits.

## V. CONCLUSION

Accordingly, for the reasons stated above, plaintiff's Motion for Remand or Reversal (Dkt. #20) is **granted**, and defendant's Motion for Order Affirming the Decision of the Commissioner (Dkt. #24) is **denied**.

The parties are free to seek the district judge's review of this recommended ruling. See 28 U.S.C. §636(b)**(written objection to ruling must be filed within ten days after service of same)**; Fᴇᴅ. R. Cɪᴠ. P. 6(a) & 72; Rule 2 of the Local Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; Small

v. Secretary of HHS, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit)**.

Dated at New Haven, Connecticut, this 30th day of January, 2009.


/s/Joan Glazer Margolis, USMJ
Joan Glazer Margolis
United States Magistrate Judge